NON-CONFIDENTIAL
No. 05-248C
(Judge Wheeler)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JONATHAN ASTOR, ET. AL,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

APPENDIX TO DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

FRANKLIN E. WHITE, Jr.
Assistant Director

TARA K. HOGAN
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.,
Attn: Classification Unit, 8th floor
Washington, D. C. 20530
Tele: (202) 616-2228
Fax: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

MARGARET WRIGHT
Office of Chief Counsel
Federal Law Enforcement Training Center
Building 94, Suite 100
Glynco, GA 31524

August 17, 2007

# INDEX

PAGE

Excerpts from Christopher A. LaFollette's Deposition Transcript . . . . . . . . . . . . . . . . . . . . . . 534

DHS Federal Law Enforcement Training Center Merit Promotion Announcement . . . . . . . . . 567

CBP Officer Position Description . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 579

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COPY

| | | |
|---|---|---|
| JONATHAN D. ASTOR, et al., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No. 05-248C |
| THE UNITED STATES, | ) | (Judge Williams) |
| Defendant. | ) | |

Deposition of CHRISTOPHER A. LaFOLLETTE, taken on behalf of the Defendant, held at the Federal Law Enforcement Training Center, U.S. Department of Homeland Security, Office of Legal Counsel, 1131 Chapel Crossing Road, Building 94, Glynco, Georgia, on Wednesday, February 14, 2007, commencing at 8:36 A.M., before Janell A. Buchanan, Certified Court Reporter and Registered Professional Reporter.

JANELL BUCHANAN, CCR, RPR
1825 Glynn Avenue, #61
Brunswick, Georgia 31520
(912) 264-1552

# APPEARANCES OF COUNSEL

For the Plaintiffs:

MOLLY A. ELKIN, Esquire
Woodley & McGillivary
1125 15th Street, N.W. - Suite 400
Washington, D.C. 20005

For the Defendant:

TARA K. HOGAN, Esquire
U.S. Department of Justice - Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

and

MARGARET WRIGHT, Esquire
Attorney/Advisor
Office of Legal Counsel - FLETC
1131 Chapel Crossing Road
Building 94 - Suite 100
Glynco, Georgia 31524

ALSO PRESENT:

GEORGE W. FOLEY
CARLOS PATRICK
THOMAS PEGULA

# I N D E X


| | |
|---|---|
| Disclosure | Page 4 |
| Witness Sworn | Page 5 |
| Opening Remarks | Page 5 |
| Examinations: | |
| Direct Examination by Ms. Hogan | Page 5 |
| Cross-Examination by Ms. Elkin | Page 69 |
| Errata Sheet | Page 76 |
| Attestation | Page 77 |
| Certificate of Reporter | Page 78 |


\- - -

# E X H I B I T S


| | |
|---|---|
| Exhibit No. 1 for Identification (A 26-page document entitled "Performance Appraisal") | Page 34 |
| Exhibit No. 2 for Identification (A seven-page "Position Description") | Page 58 |

# D I S C L O S U R E

Pursuant to Article 8.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a sole practitioner. I was contacted by Advanced Verbatim Reporting to provide court reporting services. I will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37 (a) and (b).

I have no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. I will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

Date: ______________ ______________________________

Janell A. Buchanan, B-1914

CHRISTOPHER A. LaFOLLETTE,

having been produced and first duly sworn as a witness, then testified as follows:

DIRECT EXAMINATION

BY MS. HOGAN:

Q. Good morning, Mr. LaFollette.

A. Good morning.

Q. We just met a few moments ago. Ny name is Tara Hogan, I am an attorney with the Department of Justice, and I am assigned to represent the United States in a lawsuit entitled Jonathan Astor, et al., versus The United States, which has been filed in the Court of Federal Claims.

I understand that Ms. Elkin will be representing you today?

A. Um-hum (affirmative).

Q. Mr. LaFollette, have you ever had your deposition taken before?

A. I have but it's been a long time.

Q. What was the nature of that?

A. It was a court case involving an accident through work.

Q. And were you a witness or a plaintiff?

A. I was a witness.

Q. Did you ever testify at trial?

A. On that case, no.

Q. Have you ever testified at trial?
A. I've testified in court as a police officer.
Q. Well, I'm sure you understand this, but I'll go over the ground rules. I will be asking you a series of questions and your job is to answer them as truthfully and as completely as possible.
A. Okay.
Q. If you don't remember anything, you can say so, but if you think you remember, you should try to answer as best as you can.
A. Okay.
Q. If you do not understand any of the questions that I ask you, please let me know, I can rephrase the question or explain it so that you can understand it.
A. All right.
Q. As you know, you took an oath today so that nature of the oath requires you to answer each question fully and to the extent that you can. Do you understand that?
A. Yes.
Q. And, as you can see, the court reporter is recording everything that we say here so it's important to answer verbally with a "yes" or a "no" as opposed to nodding our head or saying "um-hum," which we have a tendency to do, all of us, so I'll remind you if that becomes a problem for either of us.

A. Okay.

Q. Have you taken any medication today that would affect your ability to testify honestly?

A. No, ma'am.

Q. Okay. Is there any other reason why you are not otherwise prepared to give full and honest testimony today?

A. No, ma'am.

Q. From time to time your counsel may give an objection and after her objection I'm going to ask you to go ahead and answer the question unless your attorney instructs you not to answer. Do you understand that?

A. Yes, ma'am.

Q. Did you review any documents to prepare you for your deposition today?

MS. ELKIN: Objection. I just will caution the witness not to discuss any documents that he may have reviewed with his attorney, but otherwise he may answer the question.

A. We talked about the case and --

MS. ELKIN: Again, I don't want you talking about anything that you and I talked about. And the question had to do with documents, so if you do not -- you can talk about any documents you reviewed, other than documents you may have reviewed with me.

A. No.

Q. Okay. All right. Let's just start with a little bit of background. When did you graduate from high school?
A. 1982.
Q. Did you attend any college or community college after that?
A. No, ma'am.
Q. What was the next thing you did after you graduated from high school?
A. I went to work at a couple of different jobs after high school. Just kind of odd jobs.
Q. What would you say the first real job or serious job that you had was?
A. In 1987 I was hired by the Central Intelligence Agency as a police officer.
Q. Prior to that did you have any security or police officer experience?
A. No, ma'am.
Q. And can you describe the type of training that you received to become a police officer with the CIA?
A. I attended a nine-week police program here at the Federal Law Enforcement Training Center, and then following that I spent another month at the CIA working on agency-specific issues and things that related to the Uniform Division.
Q. And what were your duties as a police officer there?

A. To enforce laws, agency regulations, make arrests. Those type things.

Q. Were you working on different cases or were you working as a security officer?

A. It was security officer/police officer. We patrolled our agency compounds and our leased building facilities in the northern Virginia area.

Q. And how long were you a police officer with the CIA?

A. Approximately eight years, nine years.

Q. Did you receive any promotions during that time?

A. Yes, ma'am.

Q. What were your promotions?

A. I was promoted to sergeant and lieutenant.

Q. Did your duties change or your responsibilities change?

A. Yes, ma'am.

Q. What additional duties or responsibilities did you have?

A. I supervised a shift of a hundred officers, making out schedules, writing performance appraisals, conducting roll call.

Q. Did you have any teaching responsibilities?

A. Not at that point.

Well, excuse me, I did. I worked as a part-time

instructor at that point. It wasn't a full-time duty, it was an auxiliary duty.

Q. What were you teaching?

A. Firearms.

Q. Were you teaching firearms to other CIA police officers?

A. Yes, ma'am.

Q. Was that duty at the CIA Headquarters or was it at FLETC or somewhere else?

A. It was at an auxiliary site for the agency.

Q. Did those teaching duties have a practical component?

A. I'm not sure I understand.

Q. Were you in the -- were you teaching in the classroom?

A. No, ma'am. It was mostly on the range.

Q. Were the students new police officers?

A. Some were new; some were already police officers. It was a lot of requalifications, in-service training, and those type things.

Q. After your job as a lieutenant with the police force, what was your next job?

A. I was an instructor for the CIA.

Q. Do you remember what year that was?

A. '96.

Q. Were you teaching at the CIA academy?
A. I was teaching at one of their training facilities.
Q. Where was that facility?
A. I'm not at liberty to say. It's classified.
Q. Okay. At a classified facility?
A. Exactly.
Q. Were you teaching firearms there?
A. Yes, ma'am.
Q. Were you teaching any other courses?
A. Yes, ma'am. Firearms tactics, defense tactics, CPR, protective operations.
Q. Did you receive any training to become an instructor?
A. Yes, ma'am.
Q. Can you describe the training?
A. I was detailed here in '92 from CIA as an instructor and I spent two years here as a firearms instructor. I went through the Firearms Instructor Training Program here. I went through -- FLETC has a program where it certifies instructors, and I went through that program.
Q. So in 1992 you came to FLETC?
A. As a detailed instructor, yes, ma'am. I was still a uniformed police officer but I was detailed here as an instructor.
Q. So you went through the usual instructor training?

A. Yes, ma'am. There is a three-phase program that FLETC uses to train their instructors here.

Q. So in 1996 you began as a full-time instructor with the CIA?

A. Yes, ma'am.

Q. How long were you in that position?

A. Until August of 2002.

Q. Where did you go then?

A. I came here to FLETC and worked for the Transportation Security Administration.

Q. You were an instructor?

A. Yes, ma'am.

Q. What was the grade level that you started at?

A. Where?

Q. I'm sorry. In 2002 at FLETC.

A. It was a banded pay scale. It was equivalent to a GS-12.

Q. So you were detailed from TSA?

A. TSA had an academy here on center.

Q. Okay. Your students would have been only TSA students?

A. At that time, yes, ma'am. We trained federal air marshals, which at that time were under TSA. We have trained the federal flight deck officers, which were the pilots going into the cockpits, but they weren't TSA employees, but

they were under TSA auspices.

Q. Okay. You were teaching firearms?

A. Yes, ma'am.

Q. Were you teaching any other course?

A. No, ma'am.

Q. Okay. After 2002 did you eventually become an employee of FLETC?

A. Yes, ma'am.

Q. When was that?

A. November of 2003.

Q. Have you had that same position?

A. Yes, ma'am.

Q. And that's a GS-12 position?

A. Yes, ma'am.

Q. Let's go back to 1992 when you first came down here. You said that you received the three-phase training program. Can you describe that training to me?

A. I had a training officer. I had -- in Phase I, I had to review classes, attend -- listen to other instructors teach, view different instructors, get different perspectives on how different classes were taught, and things like that.

Phase II, I began following my training officer as a -- helping out as an assistant coordinator on a class, seeing how the coordinating duties, what the responsibilities were, following his lead.

And then in Phase III, you coordinate a class on your own and then you get a letter of recommendation from your training officer.

Q. You said in Phase I that you reviewed classes?

A. You sat in, listened to other instructors teach courses, getting different perspectives on the same class from different instructors. You review a minimum of three classes a day.

Q. How long did you spend in that Phase I?

A. I'm not sure. Several months. I couldn't say exactly.

Q. And then how would you know that you were eligible for Phase II?

A. That was based on my training officer's recommendation.

Q. Do you remember your training instructor?

A. Larry McIntosh.

Q. What would you do as an assistant coordinator?

A. You would help set the range up, assist the coordinator with paperwork, turning in guns, turning in ammunition, make sure, you know, score sheets are filled out correctly. Those type of duties.

Q. What do you need to do to set the range up?

A. Well, as far as turning the range on, make sure the lighting is on; make sure the public address system is on;

make sure there's enough targets, cardboard, staples, the staplers are filled up; make sure the target equipment works, or working properly; make sure the computer is running. Those type things. Set ammunition out, set the guns out, eye and ear protection, safety equipment out. Those type things.

Q. What kind of paperwork would you be assisting with?

A. Score sheets. Daily score sheets with ammunition totals. Score sheets for practical exercises. Those type of things. Any remedial forms for students that had problems qualifying or after-hours forms for students that had trouble and needed a little extra help after hours. Those type of forms.

Q. Are those score sheets for individual students?

A. It's in a class of 48 in a class and they are broken into A and a B half, so there's 24 in a half, so there is a list -- the score sheet has 24 students on it.

Q. Okay. And the ammo total is something you need to keep track of?

A. Yes, ma'am.

Q. Every day?

A. Yes, ma'am.

Q. And that's --

A. For accountability purposes.

Q. -- how much ammo you use? What was left over?

A. What was issued, what we used, and what was brought back.

Q. Do you remember how long you spent in Phase II?

A. No, ma'am. Several months. The whole -- the whole -- the three phases last approximately nine or ten months. Something like that.

Q. In the third phase you coordinated a class by yourself?

A. Yes, ma'am.

Q. What does coordinating a class involve?

A. It involves doing all the lectures, teaching all the classes on the range, ensuring that everything is set up, that all the guns are ordered, the ammunition, the right amount of ammunition, is ordered, that the ranges are scheduled properly, that students know where to show up on what day, what range to show up, make sure that facility is ready to go when students get there. That everything is properly set up and ready to go when the students get there.

Q. Do you have any help with that?

A. Sometimes you do; sometimes you don't.

Q. You mentioned remedial forms. What would those be?

A. If a student fails to qualify on their qualification course or fails a practical exercise, then they would be put into a remedial program, meaning they would come after

hours and remediate. They have a certain number of hours, depending on what the subject is, what the practical exercise is, to remediate, to try and then get another attempt to pass it.

Q. So is that remediation time the same thing as the after hours?

A. No, ma'am.

Q. What is the after hours?

A. The after hours is an intermediate program for shooters that midway through their training are struggling, having problems with their shooting, and it's an opportunity to get them a little bit of extra help to keep them out of a remedial program.

Q. So if a student fails a practical exercise or qualification, they would automatically be sent to remediation?

A. Yes, ma'am.

Q. But if you as an instructor saw a student struggling you might recommend them for --

A. Yes, ma'am. If they meet certain criteria.

Q. What would those criteria be?

A. Well, for instance, a shooter that didn't meet a certain score on a practice phase of the qualification course, then at a certain point in the training would be sent to intermediate.

Q. Is there any other reason they would be sent to

A. No, ma'am.
Q. Okay. How many hours a week do you spend teaching classes?
A. As the lead instructor or working classes, period?
Q. Break it down for me.
A. All right. As the lead instructor -- do you want hours or percentages?
Q. Either one.
A. I probably spend less than two percent of my time as the lead. Probably 70 percent of my time as a line officer/ safety officer working the line.
Q. When you say line officer/safety officer, you were working with a lead instructor in a class?
A. Well, the lead instructor is in the tower running the course and you are on the line working with the students.
Q. And what are you doing with the students?
A. Teaching them firearms fundamentals, teaching them firearms techniques, fundamentals of marksmanship.
Q. So this is the hands-on training?
A. Yes, ma'am.
Q. So you spend 70 percent, you estimate, as a safety officer/line officer and less than two percent as a lead instructor. What do you do with the rest of the time?
A. I work on -- occasionally I work on lesson plans, I work on special projects for branch chiefs, and then I work

with a lot of the military groups that come in here. We have a lot of military groups that come in here, so I teach classes for them. And then I work other programs on the center teaching firearms.

Q. How does teaching the military groups differ from what you do?

A. Different -- different techniques. Things like that.

Q. Is it a different curriculum?

A. Sometimes.

Q. I understand that some of the partner agencies have their own specific curriculum.

A. Yes, ma'am.

Q. Would the military groups sometimes have their own?

A. Yes, ma'am.

Q. And you said you teach courses for FLETC as a whole?

A. Um-hum (affirmative).

Q. What kind of courses are those?

A. Teaching protective service operations training course.

Q. What does that mean?

A. Teaching how to teach or how to conduct protective details.

Q. Who are the students in those classes?

A. They are federal agents from around the country, mostly in the D.C. area, that conduct protective details for cabinet level or high level government officials.
Q. Are those classes taught here at FLETC?
A. Yes, ma'am.
Q. How many different courses do you teach?
A. Well, we have less- -- we have probably 200 lesson plans and we need to be prepared to teach all of them.
Q. As a practical matter, do you sometimes teach some courses more often than others?
A. Yes, ma'am.
Q. What courses are those?
A. Criminal Investigator Training Program. Uniform Police Training Program. Land Management Training Program. Those are the basic classes. And then advanced classes, it varies, depending on what advanced class is running, but I work a variety of advanced classes as well.
Q. How long are the basic courses?
A. Anywhere between nine to approximately eighteen weeks, depending on the course.
Q. Is all of that spent with the Firearms Division or --
A. Not all of it, no, ma'am.
Q. Do you know what percentage or how many hours?
A. I'm not sure. I'm not sure the exact number of

lesson plans --
A. Approximately.
Q. -- for the Firearms Division? How would you access those lesson plans?
A. We have a -- on our instructor guide on our desktop we have to access it, if we wanted to pull lesson plans up.
Q. So it's on the computer?
A. Yes, ma'am.
Q. Do you always pull up the lesson plan if you are teaching a course?
A. If it's a course that I teach on a regular basis, no, not unless there is an update or something that comes out that I need to review the lesson plan because there has been a change made to it, and that's announced to the whole division when changes are made.
Q. So if it's a course that you have taught before, you would only rely on the instructor guide and your memory?
A. Um-hum (affirmative).
Q. Is the instructor guide also available on your computer?
A. Yes, ma'am, as well as in the tower on the range, so if the instructor wants to pull it up there, he can, too.
Q. Do you do any revision or review of lesson plans?
A. I'm responsible for two lesson plans.

Q. Which two are those?
A. Concealed Carry, and I believe the other one is Standing Disabled.
Q. Would these be lessons that would be taught in more than one course?
A. They can be.
Q. When you say that you are responsible for those two lesson plans, what are your responsibilities?
A. I'm responsible for reviewing them, making sure there are no grammatical errors, that it's in the proper format. Since the formats tend to change every year or two, we have to reformat them and make sure the fonts are right, and things like that.
Q. Do you review them for substance?
A. Yes, ma'am.
Q. And what would you be looking for?
A. Make sure that the techniques are still current, read them and make sure that it flows and the instructors can understand how it reads, and things like that.
Q. How do you know if techniques are still current?
A. Well, when we go to training and things like that we pick up new techniques and see things and look at what is being taught other places as well. Plus, when new instructors come in from the field, if they have got something to add then we look at what they are doing, and things like that.

Q. Do you do any book research?
A. Occasionally.
Q. Are there certain authorities on firearms that you know of?
A. There's lots of people that claim to be authorities. Whether they are or not, I don't know, but they claim to be.
Q. I'm interested, why do you say that they claim to be authorities?
A. Well, a lot of people can claim to be an authority on something. They take one class in it and they can claim to be an expert or an authority or something like that. There is a lot of so-called fly-by-night trainers out there.
Q. Would these be people in the private sector?
A. Generally, yes, ma'am.
Q. So when you say you are responsible for reviewing lesson plans, you review them for grammar, for format, you would review them for substance. Is there anything else that you are doing? Anything else that you are looking for?
A. No, ma'am.
Q. How often are lesson plans reviewed?
A. It just went to once a year.
Q. So when you have the task of reviewing one of these lesson plans, how long does that generally take?
A. Depending on the size of the lesson plan, it can take anywhere, hour, two hours, max, probably.