IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JONATHAN D. ASTOR, et al. | |
| | Case No. 05-248C (Judge Williams) |
| Plaintiffs, | |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

**APPENDIX TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT REGARDING LIQUIDATED DAMAGES**

Molly A. Elkin
WOODLEY & McGILLIVARY
1125 15th Street, N.W.
Suite 400
Washington, DC 20005
Phone: (202) 833-8855

Attorneys for Plaintiffs

## Table of Contents

Deposition of Dennis Brickhouse ........ 1

Deposition of Connie DeLaney ........ 3

Deposition of Walter Koran ........ 21

Exhibit 1 ........ 33

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COPY

| | | |
|---|---|---|
| JONATHAN D. ASTOR, et al., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No. 05-248C |
| THE UNITED STATES, | ) | (Judge Williams) |
| Defendant. | ) | |

Deposition of DENNIS BRICKHOUSE, taken on behalf of the Plaintiffs, at the Federal Law Enforcement Training Center, U.S. Department of Homeland Security, Office of Legal Counsel, 1131 Chapel Crossing Road, Building 94, Glynco, Georgia, on Tuesday, June 27, 2006, commencing at 9:53 A.M., before Janell A. Buchanan, Certified Court Reporter and Registered Professional Reporter.

JANELL BUCHANAN, CCR, RPR
1825 Glynn Avenue, #61
Brunswick, Georgia 31520
(912) 264-1552

supervisors --

A. No.

Q. -- to come to your conclusion that they were properly classified as FLSA exempt?

A. No. As I stated before, just based on my professional experience of working with classification.

Q. And would you agree that your determination was based solely on the position description?

A. Based solely on the position description, right, as well as with the criteria that's depicted in Title 5, Part 551.

Q. Right. But with respect to your knowledge of the job duties and that kind of thing, and applying that to the criteria, you would agree that your determination, as it were - that the positions were properly classified as FLSA exempt - was based solely on your review of the position descriptions?

A. Yes.

MS. ELKIN: Okay. I don't have anything further.

MS. HOGAN: Can I just ask a quick clarifying question?

MS. ELKIN: Sure.

CROSS-EXAMINATION

BY MS. HOGAN:

Q. Mr. Brickhouse, I think you stated that since 1998 there has not been a review or a change in the position description?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COPY

| | | |
|---|---|---|
| JONATHAN D. ASTOR, et al., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No. 05-248C |
| THE UNITED STATES, | ) | (Judge Williams) |
| Defendant. | ) | |

Deposition of CONNIE DeLANEY, taken on behalf of the Plaintiffs, at the Federal Law Enforcement Training Center, U.S. Department of Homeland Security, Office of Legal Counsel, 1131 Chapel Crossing Road, Building 94, Glynco, Georgia, on Tuesday, June 27, 2006, commencing at 11:02 A.M., before Janell A. Buchanan, Certified Court Reporter and Registered Professional Reporter.

JANELL BUCHANAN, CCR, RPR
1825 Glynn Avenue, #61
Brunswick, Georgia 31520
(912) 264-1552

MS. HOGAN: She is here on A, B, I, and J.
BY MS. ELKIN:
Q. Ms. DeLaney, if you can turn to the first tab in that notebook, behind the first tab in what has already been marked as Plaintiff's Exhibit 1, and if you could just review Paragraphs A, B, I, and J, and let me know. The question is: Do you feel competent to testify on behalf of the agency with respect to the matters set forth in those paragraphs?
A. A, B, I, and J?
Q. That's correct.
A. Yes.
Q. What is your job here at FLETC?
A. Human Resources Officer.
Q. What grade is that?
A. GS-201-15.
Q. GS-15?
A. Yes.
Q. Are you the head of the Human Resources Division?
A. Yes.
Q. Are you called a Chief?
A. Division Chief, yes.
Q. How long have you been the Division Chief?
A. Since January of 2002.
Q. Prior to that, what did you do?

Do you want details about what's in those program areas?

Q. Let me ask you about the classification. Does that mean that Mr. Brickhouse reports directly to you?

A. Yes.

Q. So would you agree that with respect to the classification one, is that where the Fair Labor Standards Act area would come in?

A. That's where those determinations are initially made with the job descriptions.

Q. And as the division chief overseeing in part the Classification Branch -- would you call it a branch?

A. It is.

Q. Okay. Would you agree that you are the person at the agency who is responsible for ensuring compliance with the Fair Labor Standards Act?

A. Yes.

Q. Why don't you tell me what kind of training you have had with respect to the FLSA.

A. Well, I haven't had any specific training on FLSA in the work that I've done in HR, other than just its application in writing job descriptions and the general knowledge that you would have to have that would be required in describing position descriptions and making those determinations.

Q. All right. So you would agree you haven't been to

any formal type of training for it?

A. No.

Q. No?

A. Not that I can recall, anyway. I think there was some FLSA training that was done here. What did we do? We did -- I think it may have been like a video teleconference or something that was a seminar-related type of training program for the Classification Branch and the specialists, and I stuck my head in a couple of times but the training wasn't actually for me, it was for the Classification Branch, so other than that I haven't attended a formal seminar or training program.

Q. Are you familiar with the fact that OPM issued some proposed regulations with respect to Part 551 of its regulations? They did this in May of this year?

A. No.

Q. So then it's fair to say that you haven't tasked anybody in the agency with providing comments to OPM about OPM's revised regulations or proposed regulations?

A. If there are revised regulations, I haven't seen them yet. If and when I do, then obviously, yeah, they would be passed on to our Classification Branch to respond to them.

Q. What exemption is the government claiming for the employees who occupy the GS-1801 instructor position in the Firearms Division?

A. What -- well, they are classified as being exempt from FLSA.

Q. Under which exemption?

A. The administrative.

Q. Is that your understanding of the only exemption the employer is claiming?

A. That's my understanding, yes.

Q. What is the precise role in your job in determining whether the instructors -- and when I refer to the instructors I'm just referring to the instructors in the Firearms Division at this point.

A. Okay.

Q. Okay. What is the precise role in your job in determining whether the instructors fit within the administrative exemption or whether they don't fit within it?

A. My personal role would not be any other than making sure that the managers that were responsible for making those determinations were making them accurately, and as you've indicated before, obviously I have the overall responsibility for the HR programs, and that would be one of them, but I personally don't make those determinations myself.

Q. Who made the determination here at FLETC that the 1801 instructors in the Firearms Division fit within the administrative exemption to the FLSA?

A. Well, just in looking at some of the documents that I reviewed just in trying to prepare for the deposition, it appeared that obviously our Human Resources Office would have been responsible for making that determination, and more specifically the Classification Branch within our Human Resources Office.

Q. And who? What person? What names can you give me of people who were involved in the decision?

A. That, I would be speculating on. It depends on the time frame. We have had somewhat of a transition in the Classification Branch and the HR altogether over the last few years. As I've indicated, I've been here since 2001. As far as determinations that would have been made previous to that, it would have been whoever might have been sitting in that seat at the time, and I don't really know with any, I guess, certainty who that might have been.

Q. Since you have been here in 2001, has the 1801 position been looked at in terms of its exemption?

A. Yes.

Q. Okay. And who looked at it since 2001?

A. Well, since 2000 -- well, I'm sorry, you said since 2001?

Q. Well, since you have been here. I mean, what are your furthest history back that you know of that you have been educated on as the 30(b)(6) witness?

A. It looks like there were -- there was some advisory that was provided in 2001 on the status of law enforcement officers, in general, and I understand that you are speaking specifically about the Firearms Division, but there was some assessment that was done, at least that I can look to and say somebody made an assessment in 2001 and in 2000, that identified the positions as being exempt.

Now, since 2001, which I think was your question, so I'm sorry I answered that before.

Q. That's okay.

A. But since 2001, off the top of my head I can't recall where that issue has come up, and perhaps because of the recency of, you know, some advisory being given to management on whether or not the positions were considered exempt or nonexempt, again in 2001, but I have not since then seen any requests from management that we needed to revisit that issue until now.

Q. Do you know why the exemption status of the instructors was analyzed in 2001?

A. It looks like, from what I can ascertain -- again, and that, unfortunately, predates me, too, by a few months, that there were several areas that were kind of being reviewed. The FLSA status happened to be one of those, but it looks like what was also being discussed as an advisory was the classification of the positions and whether the grade

levels were appropriate and just overtime as a general category.

Q. Do you know what documents were relied on the last time that this was -- when I say "this," the analysis of the position was done back in 2001?

A. In 2001, I don't. I can only presume that they were related to OPM guidance on FLSA determinations and classification standards, since those appear to be the two topics that that memo addressed.

Q. But you don't have any specific knowledge of what documents were relied on by whoever it was that was conducting that analysis?

A. No.

Q. Have you reviewed any Department of Labor regulations in your job as the division chief for -- division chief for --

A. Yeah, Human Resources.

Q. -- Human Resources?

A. Department of Labor regulations? Recently, you mean, or --

Q. At any time with respect to FLSA exemptions.

A. I really haven't had a need to. Again, I've kind of scanned some of those documents now, or in preparation for the deposition, and in understanding -- I think my first knowledge about this case was sometime back in December

of last year, so ...

Q. Okay.

A. And we haven't really done any extensive research on it. I haven't, personally, since then.

Q. Have you directed anybody to do research?

A. In preparing for the deposition, yes, I did ask Mr. Brickhouse to review FLSA regulations and anything that would be relating or pertaining to this case in anticipation of what he might need to respond to as the branch manager for classification.

Q. But that was all in preparation for the deposition; is that correct?

A. Right. There haven't been any other management requests to review FLSA determinations, to my knowledge, since that 2001 advisory, at least from what I've seen and recall.

Q. Have you reviewed any court decisions in -- I guess since you have been here with respect to the FLSA status of the instructors?

A. I have not.

Q. Have you directed anybody to?

A. No. There really hasn't been a need to.

Q. How about OPM regulations, have you reviewed the OPM regulations, other than preparing for today's deposition? I understand that you've done that.

A. I really haven't had a need to do that.

Q. Okay.

A. There would normally be something that would prompt that. There is an advisory request from management, there is a challenge from an employee, there is something that prompts -- that will prompt that action, and I'm not aware of anything that's come up since 2001 where that's been an issue.

Q. Do you know when this specific lawsuit was filed?

A. No, other than the contact that was made with the Human Resources Division in December 2005 that we were to try to provide documentation, you know, in response to some of the plaintiffs' --

Q. Discovery requests?

A. Um-hum (affirmative).

Q. Okay. Have you or have you instructed any one of your subordinates to conduct employee interviews to find out what the instructors do on a day-to-day basis?

A. I haven't instructed anyone to do that, no, though it is perhaps inherent with some of the classification functions. If you were doing desk audits or something like that, if that request had come in, then we would do that.

Again, relating it specifically to the Firearms Division, I don't know that there has been any requests for position reviews of that nature, and if they would come into

the office it would probably go directly to the branch chief, since that's just a function of what they do as part of the classification program.

Q. Okay. But you would agree then that you have not directed any of your branch chiefs or any of his subordinates or the prior branch chief, Evelyn?

A. Um-hum (affirmative).

Q. What's her name?

A. Evelyn Cockrum.

Q. Okay. Evelyn to conduct any interviews of the firearms instructors to determine what they do on a day-to-day basis?

A. No.

Q. Okay.

A. Now, I have asked them, obviously, to look at the job descriptions in the Firearms Division for FLSA determination, since that was the subject of, you know, the issue that we found out about in December.

Q. And would that have been Evelyn you asked to look at the PDs or was that --

A. Evelyn, as well as Mr. Brickhouse, when he arrived as well.

Q. And Mr. Brickhouse already testified that he looked at the PDs for the firearms instructors. Okay. Did you direct Ms. ...

A. Cockrum?
Q. Cockrum? C-o- --
A. C-o-c-k-r-u-m.
Q. Did you direct Ms. Cockrum or Mr. Brickhouse to interview any supervisors of the firearms instructors to determine the instructors' day-to-day job duties?
A. I haven't directed them to do that, although they may have.
Q. But you never directed them to do that?
A. No.
Q. And you have no knowledge of them doing that?
A. No.
Q. Okay. And you did not specifically interview the supervisors --
A. No.
Q. -- to determine the employees' day-to-day job duties?
A. No.
Q. Would you agree that -- okay, Ms. Cockrum, who preceded Mr. Brickhouse -- Mr. Brickhouse testified that he agreed that the positions were classified correctly as exempt, and he further testified that his determination was based solely on his review of the position description. Do you have an opinion about whether the instructor positions are classified correctly?

out and interviewed anybody about their jobs?

A. Unh-unh (negative). No, I don't.

Q. And you never directed her to do that?

A. Unh-unh (negative). No.

Q. Do you know whether the FLSA exemption status of the firearms instructors is based on their pay grade?

A. Not solely, no.

Q. Is it based in part on the pay grade? Do you know?

A. Well, that's something that you might use as kind of a general guide in looking at whether or not you think the position might be exempt or nonexempt, but it's certainly not the only factor that you would look at. You would look at what the duties are basically, again if you're applying it to the administrative criteria.

Q. What documents do you have, if any, that describe the conclusion that you reached and that -- I guess based on your subordinates' opinions concerning the FLSA classification of the 1801 instructors?

A. I haven't, again, made my own personal assessment. I have relied, for the most part, on their assessment of FLSA. And I haven't had a reason necessarily to question that, so ...

Q. I guess, well, then what documents do you have, if any, that describe the conclusions that your subordinates

major functions, um-hum (affirmative).

Q. And are you familiar with this - if you just look at the first page of this document - this OPM decision which holds that a GS-1801 law enforcement ranger who spent 20 percent of his time on program management duties was held to be FLSA nonexempt, covered by the FLSA, because he did not meet the administrative exemption criteria?

A. And your question is?

Q. Are you familiar with this decision?

A. No.

Q. So is it fair to say that you have never reviewed this decision?

A. Unh-unh (negative). I have not seen it.

Q. And nobody brought this decision to your attention?

A. I have not seen it.

Q. Do you know or under your direction has FLETC ever requested an opinion from OPM concerning FLETC's compensation policies and its practices with respect to the firearms instructors?

A. I don't think so.

Q. Do you know whether the government has ever requested an opinion from the Department of Labor about its compensation policies with respect to the firearms instructors?

A. I don't think so.

Q. And do you know whether the government ever requested an opinion from its in-house counsel regarding whether its compensation policies and practices with respect to the firearms instructors comply with the Fair Labor Standards Act?

A. I don't know. I just would think they might.

Q. Well, you don't know; is that right?

A. Um-hum (affirmative).

Q. And under your direction since 2001, I guess since you were an assistant, --

A. Um-hum (affirmative).

Q. -- did you ever ask for an opinion --

A. No.

Q. -- from the Office of Counsel about the FLSA status of the instructors?

A. No.

Q. Are you aware of the case Bates versus U.S.? There's a couple of cases called Bates versus U.S., but this one is involving supervisory border patrol agents who were instructors or are instructors here at FLETC. Are you aware of that case?

A. No.

Q. Are you aware of any arbitrations against FLETC involving the payment of wages to firearms instructors?

A. (Complying.)
Q. Is this what you were referring to earlier?
A. This looks like it, yes.
Q. Based on a review of this memo, would you agree that the union raised the FLSA status of firearms instructors as one of its concerns back in September 2000?
A. Yes, because it does say the AFGE raised the issue.
Q. And as far as you know, there were no interviews or any kind of analysis done of the employees' actual day-to-day job duties as a result of that concern?
A. I don't know. That was back in 2000, so I don't know if that occurred or not as part of the culmination of what produced this final memo.
Q. And you have no knowledge as the agency's 30(b)(6) witness, you haven't been educated on whether any kind of interviews were done during that time period?
A. No.
Q. Okay.
A. Unless it says so in here. Does it?
No, it doesn't. It doesn't say that.
Q. Do you know whether anybody -- there is a recommendation paragraph on the first page, and it says the recommendation is that the law enforcement specialist, instructor, GS-1801 positions, remain exempt from coverage under the FLSA, and then there's a line that says "Approved,"

one that says "Disapproved," and one that says "Let's discuss." Do you know what happened with this recommendation?

A. Unfortunately, not. If there is not something that shows whether it was actually approved or disapproved, I don't know. I can -- I guess since they weren't changed, I can assume that it was allowed to remain exempt.

Q. But you don't know whether anybody -- let's see. This was sent to the director, I guess, of Human Resources?

A. It is actually from the Human Resources officer back in 2000 to I would guess the director of the center.

Q. Okay.

A. Since it's going through several what are now assistant director level positions.

Q. And you don't have any specific knowledge about whether the director ever --

A. Said yes or no.

Q. -- checked one of these things?

A. I don't know if there was a final approval or a disapproval document flowing around somewhere.

Q. And again in this memo under the "Background and Analysis" section it states that the positions in the 1801 series meet the administrative exemption criteria; is that right?

A. Um-hum (affirmative).

Q. CBP, who are FLSA nonexempt? In other words, they are earning true overtime?

A. I'm not familiar with them, but if they work for another agency, I wouldn't be.

Q. But has anyone ever brought to your attention, I guess, the fact that certain firearms instructors are non-exempt who work here at FLETC?

A. There is a reference I think in one of the documents that we looked at to indicate that that would be true. Whether it is actually true or not is another thing. To state it in a document without knowing exactly whether or not that's been verified with the agency or not is quite different than knowing that that's a fact, and, unfortunately, there are some statements made about what other agencies are doing that haven't proved to be completely accurate when you do try to research it further.

Q. Okay. Have you ever researched whether other firearms instructors from other agencies who teach here at FLETC, have you ever researched their FLSA status?

A. No.

Q. Have you ever directed any of your subordinates to research their FLSA status?

A. Not that I can recall.

Q. Do the firearms instructors currently receive AUO, administratively uncontrollable overtime pay?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COPY

| | | |
|---|---|---|
| JONATHAN D. ASTOR, et al., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No. 05-248C |
| THE UNITED STATES, | ) | (Judge Williams) |
| Defendant. | ) | |

Deposition of WALTER KORAN, taken on behalf of the Plaintiffs, at the Federal Law Enforcement Training Center, U.S. Department of Homeland Security, Office of Legal Counsel, 1131 Chapel Crossing Road, Building 94, Glynco, Georgia, on Wednesday, June 28, 2006, commencing at 8:40 A.M., before Janell A. Buchanan, Certified Court Reporter and Registered Professional Reporter.

JANELL BUCHANAN, CCR, RPR
1825 Glynn Avenue, #61
Brunswick, Georgia 31520
(912) 264-1552

Operations Division?

A. Yes, that remains basically the same.

Q. Where is the -- oh, the Firearms Division is an Office of Special Training?

A. But the training divisions are all very similar.

Q. They're pretty much the same as they were?

A. The same as they were.

MS. ELKIN: All right. I guess we can mark that as Plaintiff's Exhibit 12.

(The instrument last above referred to was marked for identification as Plaintiff's Exhibit No. 12.)

BY MS. ELKIN:

Q. How would you describe the mission of -- well, let me ask you this: Does FLETC have a formal mission statement?

A. Yes, they do. I don't have it with me, but they do have a formal mission statement.

Q. And do your best to tell me what the mission is of FLETC.

A. We train those who protect the homeland.

Q. Okay.

A. We provide training to the people that protect the United States.

Q. And how would you describe the mission of the

Firearms Division within FLETC? Is it fair to say you provide training to the people that --

A. Yeah, we have a mission statement, if I can recall it from memory. The proficient, justifiable, and the safe use of firearms in the protection of the homeland.

Q. Okay.

A. That's not the exact quote.

Q. But close?

A. Yes.

Q. But it's training, isn't it? The mission is to train law enforcement officers --

A. Yes, to train officers.

Q. -- in the proficient, safe --

A. -- and justifiable and safe use.

Q. -- and justifiable use of firearms?

A. Yes.

Q. Would you agree that FLETC is a law enforcement agency, in your opinion?

A. Technically, FLETC is not a law enforcement agency.

Q. And why do you say that? I mean, why? What's the authority that you have to say that?

A. Are you talking about the instructors or FLETC, in general?

Q. FLETC, in general.

have to have a degree in education in order to become a firearms instructor; is that correct?

A. Right. They do not have to have. They do not have to have a degree, yes.

Q. Would you agree that the firearms instructors carry out the day-to-day mission of FLETC?

A. Of FLETC firearms or FLETC?

Q. Well, I think you testified that the mission of FLETC is to provide training to the people who protect the homeland.

A. Yes.

Q. So would you agree that the firearms instructors carry out that mission every day that they are here?

A. Yes. On the firearms portion of it.

Q. The firearms portion of it?

A. Yes.

Q. Right. They are not doing the Legal Division portion of it, or the --

A. Correct.

Q. -- Physical Techniques Division portion of it?

A. Um-hum (affirmative).

Q. But they do carry out the firearms mission of training law enforcement officers to use firearms properly, safely, and proficiently?

A. Yes.

Q. That's their primary job duty?

A. Yes.

Q. Are there any educational requirements to be a firearms instructor here at FLETC?

A. No, there are not.

Q. And what type of training is required to become a firearms instructor?

A. Prior to coming on board as a firearms instructor or after coming on board?

Q. Why don't you do both.

A. As Division Chief, when I'm looking for applicants for the Firearms Division I'm looking at -- you know, I would prefer a college education, but it's not required - that's just a plus - but mainly I'm looking at their law enforcement experience, I'm looking at their instructional experience in adult methodology, and also I'm looking at their firearms knowledge and ability. Those are the three main criteria.

Q. Is one more important than the other? I mean, could you come here -- let me just ask you this: Would you hire someone who has a substantial amount of law enforcement experience and an incredible amount of knowledge in firearms but who has never taught anybody anything?

A. Yes. I mean, you could, but, see, that's the unknown variable, whether or not you can make someone an instructor. Can you train someone to instruct? Maybe,

Q. So, for the most part, the meeting would be between you and your branch chiefs to discuss how we are going to allocate the funds?

A. The final decision on what to allocate and what not to allocate.

Q. Is that correct?

A. Yes.

Q. And, again, you would agree that the firearms instructors do not have the authority to commit funds?

A. To commit funds? No, they don't have the authority to commit funds.

Q. Okay. And they don't even have the authority to sign a letter coming out of the Firearms Division. Would you agree with that? Even letters that are going to other offices within FLETC, to other agencies or to the public, only you as the division chief --

A. No, I disagree with that, depending on what type of letter. They can sign letters going out.

Q. You would say --

A. Depending on the nature of the letter.

Q. I'm talking about an official Firearms Division correspondence. Isn't it true that only you, as division chief, according to SOP I, have the authority to sign official Firearms Division correspondence?

A. If it's representing the policy or the practice of the

Firearms Division, but to say all letters, no, that's not -- that's too inclusive.

Q. So it's your testimony that letters representing the official policy or practice of the Firearms Division must be signed by you and only you?

A. Yes.

Q. If you look at SOP I, FAD Correspondence. This has been effective since at least 10/2004. It looks like it was supposed to be reviewed in October of 2005. This SOP talks about FAD correspondence.

If you look to Part C, Outgoing Correspondence, which is on Page 4917, and your name is at the bottom of this SOP. It says, "Outgoing Correspondense, Paragraph 1. All outgoing correspondence from the FAD addressed to various offices within the FLETC, to the Department of Homeland Security, to other agencies, or to the public will have affixed to such correspondence the signature of the chief of the FAD."

And that would be you; right?

A. That's why I say not all correspondence, just official correspondence going outside, like it says, to different divisions, Homeland Security. Other, you know, participating agencies.

Q. Well, this says all outgoing correspondence from the FAD addressed to the various offices within FLETC, to DHS, or other agencies, or to the public will have your

A. Yes.
Q. But ultimately you are the person who is responsible for strategic organizational planning of the Firearms Division?
A. Yes.
Q. The firearms instructors are not considered management representatives in terms of handling complaints. For example, if a student complained, I don't know, of sexual harassment or something, it wouldn't be the firearms instructor who is responsible for investigating that complaint?
A. No, it would not.
Q. Okay.
A. It depends on the type of complaint.
Q. Okay. What type of complaint would the firearms instructor be responsible for resolving?
A. Well, let's just go back to EE0. The firearms instructor could be involved in the complaint process. If it's brought to the firearms instructor's attention, then the firearm instructor must proceed with it, you know, on through the channels.
Q. Through your own EEO policy here?
A. Yes, the EE0 policy. So, yes, they could be involved in it.
Q. But they wouldn't be tasked with investigating the EEO complaint; is that right?

A. No, probably not.
Q. That would be somebody in counsel's office or HR?
A. They might have to make a statement to what was observed or --
Q. As any witness would?
A. Yes.
Q. Okay. So is it fair to say then that the instructors, their job is not to investigate or handle employee or student complaints?
A. Some types of student complaints. When it comes to training and equipment and firearms, especially in firearms, you know, a shooter may say, Well, you know, I carry a 6 Sauer, or I carry a Glock on the job but I have a 6 Sauer here, do you have any Glocks you could let me use, because their agency did not ship them down, so ...
Q. In that situation you would expect your instructor to get the guy the proper gun?
A. Or, you know, a complaint where the student next to me -- I'm the student. The student next to me is unsafe.
Q. Right. So for those day-to-day -- that's not the type of complaint I'm talking about. I mean, those are day-to-day issues that would come up in any instruction setting?
A. Um-hum (affirmative).
Q. And you would expect your firearms instructors to know how to handle those types of issues; correct?

A. Yeah. Use a little discretion in how to handle it.
Q. But with respect to employee complaints, it is not the job responsibility of the firearms instructor, they are not managers, they don't supervise anyone. You agree with that; right?
A. That's correct. Technically, they do not supervise anyone.
Q. Okay. They don't do any performance appraisals for other employees?
A. No, they do not.
Q. They do not assign position descriptions to other employees?
A. No, they do not.
Q. So if an employee were to have some kind of complaint about his leave usage, or he's on some kind of performance improvement plan, it would not be the job of one of the firearms instructor plaintiffs to resolve that type of a complaint?
A. No, it would not.
Q. Okay. Who develops the budget for the Firearms Division?
A. I develop the budget.
Q. And that would be your responsibility to develop the budget? Is that on a yearly basis or how often?
A. It's on a yearly basis. I do it in conjunction with

the branch chief of the Resource Management Branch, and also we have a firearms equipment specialist who handles all the inventory, the firearms, and the ordering of ammunition, she handles the budget completely, and so ...

Q. What GS level is she?

A. GS-11.

Q. Would you agree that the firearms instructors do not negotiate contracts?

A. In fact, that's correct even through my level.

Q. You do not negotiate contracts?

A. No. That's where we have contracting officers in procurement

Q. And so it's fair to say that the firearms instructors do not administer contracts?

A. When you use the term "administer," yeah, Cathy Lee, you know, was in charge of the ammunition contracts and she is the -- she administers them, if you want to use that term broadly, because it's administered by, you know, several people.

Q. Well, I guess what I mean by that term is more technical and, that is, there is a contract in place and the employee is responsible for ensuring that payments are made on time, that checks are cut on time, that the number of -- the performance is done on time and that kind of thing.

A. That's Procurement Division.

Q. Okay.

A. But any deviations from the contract, defective ammunition --

Q. Cathy Lee would notify Procurement about?

A. Well, she prepares the material for Procurement to submit to the company.

Q. So Cathy Lee doesn't deal directly with the contractor, she goes through Procurement to ensure that you have the right number of bullets and --

A. Yes.

Q. -- that the bullets are not defective?

A. Um-hum (affirmative).

Q. And the firearms instructors do not authorize payments for goods or for services; is that correct?

A. No, they do not.

Q. And they do not procure supplies?

A. No, they do not.

Q. And you would agree that they cannot revise a lesson plan without the various levels of approval and review that we talked about in that routing exhibit that we went through?

A. Yes and no.

Yes, they can develop, they can revise it, but, again, it has to be through the system to go to the repository, and that's just the procedure at FLETC, you know, make sure

# EXHIBIT 1

DEPARTMENT OF THE TREASURY
FEDERAL LAW ENFORCEMENT TRAINING CENTER
GLYNCO, GEORGIA 31524

HRD 16-1 (HRD)

SEP 08 2000

MEMORANDUM TO [redacted]
Director

THRU: [redacted]
Associate Director
Planning and Resources

[redacted]
Deputy Associate Director
Planning and Resources

FROM: [redacted]
Human Resources Officer
Human Resources Division

SUBJECT: Proper Coverage for Law Enforcement Specialist (Instructor), GS-1801, Positions Under the Provisions of the Fair Labor Standards Act (FLSA).

REASON FOR TAKING ACTION:

Based on issues raised by AFGE 2002 at the 8/21/00 Labor-Management Partnership Council (LMPC) meeting, the Director tasked the Human Resources Division (HRD) to review the determination made to "exempt" Instructor positions from the provision of the FLSA.

RECOMMMENDATION:

That the Law Enforcement Specialist (Instructor), GS-1801, positions remain "exempt" from coverage under the FLSA.

______Approve _____Disapprove ______Let's Discuss

BACKGROUND AND ANALYSIS:

Historically, since the positions were initially established at the FLETC, the instructor positions have been determined to be "exempt" from coverage of overtime payments made under the provisions of the FLSA by meeting the "administrative" exemption criteria. Instructors are involved in the day-today mission of the FLETC yet they are responsible for doing extensive research in developing course lesson plans. They apply discretion and independent judgement. The Classification and

000001

Staffing Branch, HRD has reviewed the FLSA "exempt" determination and provided the most recent analysis at Tab A. Excerpts from 5 Code of Federal Regulations (CFR), Part 551, Pay Administration under the Fair Labor Standards Act, are enclosed at Tab B - this includes the legal definitions of the three exemption categories. Certain of the "professional" criteria would also lend credence to the exemption of the Instructor positions. In developing FLETC Directive (FD) 65-50A, Premium Pay, initially Training Technicians were considered for inclusion in positions authorized for Administratively Uncontrollable Overtime (AUO), but were then excluded due to their "nonexempt" FLSA status. One point mentioned by AFGE 2002 was the "nonexempt" status of certain detailees from other agencies and the apparent inequity of pay for FLETC employees. It must be noted that detailed personnel remain classified and paid by their parent organizations and temporarily assigned here as instructors. They keep their law enforcement status while here and can be required to perform those duties at any time - they are not classified as "instructors".

| | | |
|---|---|---|
| Attachments: | HRD Determination | TAB A |
| | FLSA Excerpts | TAB B |

000002

ISSUE: PROPER COVERAGE FOR LAW ENFORCEMENT SPECIALIST (INSTRUCTOR), GS-1801 POSITIONS UNDER THE PROVISIONS OF THE FAIR LABOR STANDARDS ACT (FLSA)

The Fair Labor Standards Act of 1938 provides for overtime compensation for work performed in excess of 40 hours in a work week to federal employees that meet the criteria according to 5 CFR 551. However, the act provides an exemption from this requirement for positions that are designated and meet the criteria for the (1) executive, (2) administrative or (3) professional field.

The Human Resources Division has determined that the Law Enforcement Specialist (Instructor), GS-1801, positions at the Federal Law Enforcement Training Center meet the FLSA exemption criteria as administrative positions and are therefore, designated "Exempt" from the provisions of the FLSA.

FLSA Administrative Exemption Criteria:

An "exempt" Administrative employee is an advisor, assistant or representative of management, or a specialist in a management or general business function or supporting service whose position meets the criteria in Sections A through D below:

A. The employee's primary duty (the primary duty is that which constitutes the major part – over 50% of the employee's work) consists of work that:

1. Significantly affects the formulation or execution of management policies or programs; or

2. Involves management or general business functions or supporting services of substantial importance to the organization serviced; or

3. Involves substantial participation in the executive or administrative function of a management official.

000003

B. The employee performs office or other predominantly nonmanual work which is:

1. Intellectual and varied in nature; or

2. Of a specialized or technical nature that requires considerable special training, experience, and knowledge.

C. The employee must frequently exercise discretion and independent judgment, under only general supervision, in performing the normal day-to-day work.

D. The employee's position is classified no lower than GS-7 or the equivalent in other white collar pay systems.

The Law Enforcement Specialist positions meet the Administrative criteria based on:

A) The employee's primary duty is to provide high quality training to law enforcement officers from a wide variety of different Federal participating organizations and to instill the technical and analytical knowledges, skills and attitudes needed for the highest possible proficiency in their specialized field. The employee performs these duties 50% of the time and the work performed significantly affects the execution of FLETC's programs and supporting services, which is to train law enforcement personnel. The work directly affects the quality and effectiveness of various law enforcement training programs. The position's goals are to ensure that a professional training program is maintained, requiring the incumbent to plan, organize and follow through by implementing comprehensive programs to meet the overall training objectives.

B) The work of the incumbent is considered specialized and technical in nature due to the specialized knowledge requirement to have experience in a law enforcement environment which demonstrates knowledge of enforcing the criminal laws of either Federal, state or local jurisdictions. This knowledge is required to train and/or instruct personnel in their specialty areas. Experience in law enforcement

techniques is necessary to ensure that course content and materials presented remain in touch with the realities of the environment in which students will be working and to maintain credibility.

C) The employee independently evaluates student progress results, formulates decisions in the development and delivery of training progress. The student's performance is judged by the results of the incumbent's planning, coordinating, organizing and directing abilities in achieving high quality course development and delivery. The employees perform course-related research, and present facts and results to a broad spectrum of individuals within and outside of the Center. The employees are required to plan, organize and follow through by implementing comprehensive programs to meet the overall training objectives.

D) All positions are graded above the GS-7 level.

Based on the above evaluation, FLSA determination is "Exempt" according to the administrative criteria.